# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JONTRICE D. SEARS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:05cv304-ID |
| | ) | (WO) |
| PHP OF ALABAMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Before the court is Defendant PHP of Alabama, Inc.'s ("PHP") motion for

summary judgment, filed December 30, 2005, which the court construes as a motion for

partial summary judgment.  (Doc. No. 12.)  A brief and an evidentiary submission

accompany the motion.  (Doc. No. 13.)  Plaintiff Jontrice D. Sears ("Sears") submitted a

memorandum in response and an evidentiary submission on January 13, 2006.  (Doc.

Nos. 15-16.)  Thereafter, on January 20, 2006, PHP filed a reply.  (Doc. No. 20.)

PHP moves for summary judgment on Sears's claims for sexual harassment and

retaliation brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e-2000e-17 ("Title VII"), and her state law claims for negligence (in hiring,

supervising, training and retaining), assault, battery and invasion of privacy.[1]  Sears's

---

[1] Sears also brings a claim alleging a violation of the Fair Labor Standards Act, 29
U.S.C. §§ 201-219, for failure of PHP to compensate her for overtime hours she worked.
PHP has not moved for summary judgment on this claim.

federal civil rights claims are premised on allegations that, during her two-month
employment with PHP, Sears's co-worker, Brian Atkins ("Atkins"), sexually harassed her
and that, after she complained about the harassment, PHP failed to take adequate
remedial measures to end the harassment and retaliated against her by terminating her
employment.  After careful consideration of the arguments of counsel, the relevant law
and the record as a whole, the court finds that PHP's partial motion for summary
judgment is due to be denied on Sears's Title VII sexual harassment claim, granted on her
Title VII retaliation claim, granted on her state law negligent hiring claim, and denied on
her remaining state law claims.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant
to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights
jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  The parties do not
contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence
and make factual inferences in the light most favorable to the nonmoving party.  See
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398
U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no

2

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. <u>See id.</u> at 248; <u>Barfield v. Brierton</u>, 883 F.2d 923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. <u>See Celotex</u>, 477 U.S. at 323. The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. <u>See id.</u> at 587.

3

# IV.  STATEMENT OF FACTS[2]

Sears worked full-time for PHP as a healthcare worker from approximately March 2, 2004, until PHP fired her on May 11, 2004.  (Ex. 1 to Doc. No. 15 (Sears Dep. at 20)); (PHP Ex. E to Doc. No. 13 (form titled, "Disciplinary Action").)  She worked at a PHP group home in Elmore County, Alabama, and assisted three mentally disabled males who lived in the home.  (Sears Dep. at 21, 147.)  The residents were "high function," meaning that they needed only minimal assistance with performing daily living tasks.  (Id. at 30.)

Sears's job title was "direct support professional."  (PHP Ex. A to Doc. No. 13 (Job Description).)  Her primary job function was "[t]o provide rehabilitative services to individuals to assist them in acquiring and developing skills in self help in daily living activities, leisure activities, basic academics, communication and socialization skills."  (Id.)  Sears's job duties also included cooking and cleaning.  (Sears Dep. at 20-21.)  Sears would mop the kitchen floor, take out the trash and, in general, complete ordinary housekeeping jobs.  (Id. at 29.)

Because of the need for around-the-clock residential care, the work at the PHP group home is divided into three shifts.  The first shift is from 7:00 a.m. to 3:00 p.m., the second from 3:00 p.m. to 11:00 p.m., and the third from 11:00 p.m. to 7:00 a.m.  (Id. at 21-22.)  The first shift was worked by Nicole LNU (last name unknown) and Aubrey

---

[2] When deciding a motion for summary judgment, the court views the facts and all reasonable inferences in favor of the nonmoving party.  See Celotex, 477 U.S. at 322. This statement of facts, thus, may not represent the actual facts.

LNU.  (Id. at 21.)  The second shift was worked by Jenny Rodriguez and Reginald Kendrick.  (Id. at 22.)  Sears worked the third shift alone with Atkins, a non-supervisory, male employee of PHP.  (Id. at 21.)

### A.  The Alleged Sexual Harassment

Beginning on Sears's second day of employment, Atkins began to sexually harass Sears.  (Sears Dep. at 22.)  The harassment included a "constant" barrage of statements, including:  "Bring your sexy ass here"; "I want to see what you look like naked"; and "Get under the covers with me."  (PHP Ex. F to Doc. No. 13 (Sears EEOC Aff.).)  During her deposition, Sears provided a graphic account of Atkins's conduct which included not only comments, such as the ones above, but also nightly sexual assaults.  Sears stated that, every night when the residents were asleep, Atkins would "tr[y] to play with [her] down here and rub [her] down here [i.e., in the groin area], and he would touch [her] breasts and [her] butt and sorts of things like that."  (Sears Dep. at 23-24.)

As another example of Atkins's typical behavior, Sears testified that Atkins would sit in a chair, with an erection, "and he would pull down his pants, and it would be sticking up.  And he would say, 'Will you come get up on top of it?,'" whereupon Sears would ignore his request and go back to the kitchen to cook.  (Id. at 23.)  Atkins, however, would persist.  He would ask her to "come back in there and get under the covers with him and jump on it."  (Id. at 24.)  When she would tell him "no," he would

grab her and tell her to "bring [her] sexy red ass here" because he "wanted to f--- right now."  (Id.)

As further elaboration as to the "grab[bing]" incidents, above, Sears testified that Atkins would grab her by the front, while "rubbing [her] down below."  (Id.)  Sears would tell him to let her go, but Atkins would refuse.  (Id.)  During these times, Atkins would "finger [Sears] and rub [her] breasts and kiss [her] and hold on to [her] butt cheeks," and, on "numerous" occasions, he would "insert his finger into [her] vagina." (Id. at 24, 143.)  Atkins would continue holding her and engaging in the foregoing acts until he had an orgasm.  (Id. at 25, 143.)  After that, Atkins would fall asleep.  (Id.)

Sears testified that Atkins engaged in the foregoing type of contact with Sears "numerous, numerous times" (by Sears's estimation more than 20 times), beginning on March 3, and continuing until she "reported" it.  (Id. at 24-26, 28.)  She said, "He would just keep doing the same thing every night when I got to work."  (Id.)  After these incidents, Atkins would fall asleep, even though neither Sears nor Atkins was permitted to sleep during their shift.  (Id. at 25.)  Sears stated that she was constantly in "fear" when she went to work.  (Id. at 97, 145.)


## B.  PHP's Sexual Harassment Policy

PHP has offered evidence to demonstrate that, at all relevant times to this lawsuit, it had in place an anti-harassment policy with procedures for reporting sexual harassment. (PHP Ex. B to Doc. No. 13 (Anti-Harassment Policy).)  PHP's policy, which consists of

three pages of single-spaced, typewritten letter-size paper, sets forth that it "shall not tolerate sexual or other harassment in any form" and that "[i]t is illegal and against the policies of the program for any employee, supervisory or non-supervisory, male or female, to sexually or otherwise harass, either physically or verbally, another employee[.]"  (Id.)  The policy also defines and gives examples of prohibited forms of sexual harassment.  (Id. at 2-3.)

Furthermore, the policy sets forth three alternative means for reporting harassment.  (Id.)  It directs the employee to report the alleged harassment within 48 hours of its occurrence to either the employee's supervisor or the program manager "in cases where the supervisor's conduct is the object of the complaint," or the human resources director "when the [p]rogram [m]anager's conduct is the object of the complaint."  (Id. at 2.)  The policy expressly prohibits retaliation against an individual who brings a complaint of sexual harassment.  (Id.)

The policy ensures that all complaints of harassment shall be "immediately" investigated by the program manager (unless he or she is the harasser in which event the investigative duties are assigned to the director of operations) and sets forth detailed "suggested procedures for the investigator to follow in handling allegations of sexual harassment."  (Id. at 2-3.)  Employees who, "after appropriate investigation," are found "to have sexually or otherwise harassed another employee shall be subject to disciplinary actions up to and including termination."  (Id. at 2.)  Sears signed and dated a copy of the anti-harassment policy prior to the commencement of her employment.  (Id. at 3.)

7

Moreover, at the time Sears was hired, PHP trained new employees on its anti-harassment policy during orientation and annually thereafter.  (PHP Resp. to Interrog. 3 (Ex. C to Doc. No. 20).)  Sears has not denied that, during orientation, she received training on the anti-harassment policy.  (Sears Dep. at 124.).

C.  Sears's Reporting of the Sexual Harassment

Mary Fitzpatrick ("Fitzpatrick") was a home manager for PHP, worked in PHP's main office in Wetumpka, Alabama, and was responsible for scheduling Sears's shifts. (Sears Dep. at 33-34.)  During Sears's employment, Fitzpatrick never stopped by the group home when Sears was working the 11:00 p.m. to 7:00 a.m. shift.  Sears generally would only see Fitzpatrick if she attended a meeting at PHP's main office.[3]  (Id. at 35.) Sears considered both Fitzpatrick and Valerie Pettaway, also a home manager, to be her direct supervisors.  (Id. at 139.)

Sears testified that, on at least two occasions, she informed management at PHP of Atkins's behavior.  The first time she complained to PHP occurred after the first employee meeting Sears attended at PHP's main office with management, including Fitzpatrick and Jon Burns ("Burns"), PHP's administrator.[4]  (Id. at 31-32, 142-43.)  Sears cannot recall the exact date, but estimates that the meeting occurred about one month

---

[3] Sears testified that PHP's main office was located within an approximate 30-minute drive from the group home where she worked.  (Sears Dep. at 146.)

[4] Burns supervised Fitzpatrick and Pettaway.  (Sears Dep. at 139.)

after she began working at PHP which would have been on or around April 2, 2004.  (Id.
at 33.)  Specifically, after the meeting, Sears followed Fitzpatrick to Fitzpatrick's truck.
(Id. at 31.)  Sears informed Fitzpatrick that she felt "uncomfortable at work," and
Fitzpatrick asked Sears to explain.  (Id.)  Sears then told Fitzpatrick about Atkins's
sexually harassing behavior, including his physical contact with her, to which Fitzpatrick
responded, smiling, "Oh, Brian?" and "Not Brian."  (Id. at 31-32.)  Fitzpatrick told Sears,
"'Just try to stay away from him.'"  (Id. at 32.)  At this time, Sears asked Fitzpatrick if
she (Fitzpatrick) could move Atkins to a different shift.  (Id. at 34.)  Fitzpatrick replied
that she "would check into it."  (Id.)  Sears, however, did not hear back from Fitzpatrick.
Although Sears would page Fitzpatrick, Fitzpatrick would not return her pages.  (Id.)

The second time Sears complained was on or about May 4, 2004.  (PHP Ex. F
to Doc. No. 13 (Sears EEOC Charge).)  Having been physically assaulted by Atkins at
work the night before (Sears Dep. at 38), Sears informed her then-boyfriend about what
was occurring at the PHP group home where she worked.  (Id. at 35-36.)  Sears's
boyfriend escorted her to the PHP main office and insisted that she notify someone.  (Id.)
Sears saw Fitzpatrick and Pettaway sitting in an office, and informed them of Atkins's
behavior.  (Id. at 36-39.)  Sears wrote out a statement, which she believes Fitzpatrick and
Pettaway took to Burns.[5]  (Id.)

---

[5] The court notes that Sears's statement is not part of the record.

That same day, Sears met with Burns, Pettaway and Fitzpatrick.  (Id. at 40); (see also PHP Ex. F to Doc. No. 13 (Sears EEOC Charge).)  Burns suggested that Sears change shifts, but Sears indicated that she favored the 11:00 p.m. to 7:00 a.m. shift and that she thought Atkins should be the one to move.  (Sears Dep. at 40.)  Burns raised his voice at Sears during this meeting, and statements were made to Sears to the effect of, "You should move.  You should do this.  I don't think he is doing this, not Brian."  (Id. at 41, 43-44.)  At the conclusion of the meeting, Sears reluctantly acquiesced to changing shifts, but, after further contemplation, Sears telephoned Burns and told him that she believed she should not be the one to have to move.  (Id. at 41-42.)  During this telephone conversation, Burns stated that he would call Atkins to inquire if Atkins wanted to change shifts.  (Id. at 42.)  Subsequently, Atkins was moved to the 7:00 a.m. to 3:00 p.m. shift, and Sears remained on the 11:00 p.m. to 7:00 a.m. shift.  On his new shift, Atkins's duties included driving a van and transporting the group home residents to and from outside activities.  (Id. at 46, 49.)

After Atkins changed shifts, Sears worked with Greg Ellis ("Ellis") at the group home.  (Id. at 47.)  Ellis, however, left the home one hour early – at 6:00 a.m. – to go to his other job.  (Id. at 48.)  On approximately two or three occasions, during the last hour of Sears's shift when Ellis was gone, Atkins arrived early for his shift and taunted Sears by smiling at her and saying that he was still there, i.e., still working for PHP.  (Id. at 47, 50.)  Atkins would state that he was "going to get" Sears and that one night he was going to come to the group home and it would be the "same like it used to be."  (Id. at 50.)

10

Atkins also made obscene gestures toward Sears, in which he used his hands to simulate sexual intercourse.  (Id. at 139-40.)  Sears reported at least one of these incidents on the day of its occurrence when she "went to pick up [her] check."  (Id. at 50-51, 140.)  She reported the incident to Fitzpatrick, who told Sears that she would look into it.  (Id.)  No one at PHP, however, ever informed Sears whether anyone had investigated her complaint.  (Id. at 54.)


D.  Sears's Termination

On May 10, 2004, Sears arrived at the group home to begin her shift.  Her co-worker, Ellis, was not yet there.  (Sears Dep. at 55.)  Jenny Rodriguez and Reginald Kendrick were ending their 3:00 p.m. to 11:00 p.m. shift.  (Id. at 55-56.)  Sears observed beer bottles at the house, and she smelled alcohol on Rodriguez's and Kendrick's breaths.  (Id. at 57.)  In Sears's opinion, both Rodriguez and Kendrick had been drinking.  (Id.)  Sears paged Fitzpatrick at that time to report her suspicion, but Fitzpatrick did not return the page.  (Id. at 62.)  In a hostile manner, Rodriguez and Kendrick confronted Sears regarding whether cornbread had been burned on a prior shift.  (Id. at 57-58.)

At that time, either Rodriguez or Kendrick stated to Sears, "I'm going to show you what's wrong," and Rodriguez grabbed Sears by her hair, which she was wearing in a ponytail, and punched Sears under her eye.  (Id. at 58-59.)  Sears tried to fight back, landing at least one effective punch, but Rodriguez had Sears pinned by the hair.  (Id.

11

at 59-60.)  At that time, Kendrick struck Sears more than once and in the mouth.  (Id.
at 60.)  Sears testified that her neck was sore for two weeks after this incident.  (Id.)

After releasing Sears, Rodriguez ran out of the house and got into her truck.  (Id.
at 61.)  Sears followed Rodriguez to get her vehicle's tag number, but Rodriguez
attempted to "run over" Sears in her truck.  (Id. at 61-64.)  After the fight, Sears paged
Fitzpatrick twice and then telephoned her mother and told her what happened.  (Id. at 62.)
Sears then called "911," after which Fitzpatrick returned Sears's call. (Id.)  Sears
informed Fitzpatrick that she had called the police, to which Fitzpatrick responded, "You
don't call the police to my residence.  I'm on my way right now."  (Id.)  Kendrick
remained at the house this entire time.  (Id. at 64-65.)

Before law enforcement officials arrived on the scene, Sears's mother came to the
house, followed shortly thereafter by Sears's then-boyfriend.  (Id. at 66-67.)  Sears
informed her mother of what had occurred, and, when Sears's boyfriend arrived, Sears
informed him of the same.  (Id.)  Outside of the home, Sears's boyfriend and Kendrick
got into an altercation.  Sears's boyfriend punched Kendrick in the forehead, and both
continued fighting until Ellis interceded.  (Id. at 67-69.)  The police arrived, and Pettaway
and Fitzpatrick arrived thereafter.  (Id. at 71-73.)  There, at the scene, Sears was treated
by EMS personnel, and Fitzpatrick instructed Sears to go home.  (Id. at 75-76.)

The next day, on May 11, 2004, Sears was called to a meeting with Burns,
Fitzpatrick and Pettaway at PHP's main office.  (Id. at 82-83.)  Burns orally informed
Sears that she was terminated because "her mother tried to enter the house" and because

Sears's "visitors were fighting on [the] property."  (Id. at 83-84.)  The same day, Sears

also was issued a written "Disciplinary Action," which describes Sears's infractions as

follows:  "Failure to follow chain of command[;] unauthorized visitors on property[;]

fighting."  (PHP Ex. E to Doc. No. 13 (form titled, "Disciplinary Action").)  The form is

signed and dated by Pettaway and Fitzpatrick, as well as by individuals whose signatures

are illegible, but who identify themselves as the "program manager" and "district

manager."  (Id.); (see also PHP Resp. to Interrog. 5 (Ex. C to Doc. No. 20) (indicating

that Fitzpatrick and Pettaway were involved in the termination decision).)  The form

contains a notation that Sears refused to sign and did not "wish to comment."  (PHP Ex. E

to Doc. No. 13 (form titled "Disciplinary Action").)

　　　　Sears received a check from PHP at the same time as her termination, but the

check did not include her overtime pay.  (Id. at 84.)  Sears asked Fitzpatrick why her

overtime pay was not included in her check.  (Id.)  Fitzpatrick, however, ignored her

question and directed Sears to leave the premises.  (Id.)

　　　　As stated, neither Fitzpatrick, Pettaway nor Burns witnessed the events which

occurred on May 10 and which preceded Sears's termination.  PHP, however, received an

account of events which differs from Sears's side of the story.  Burns states that Sears

was fired, in part, based on information PHP had received that Sears had physically

assaulted Rodriguez at the group home, had initiated the altercation, and had lured

Kendrick into believing that the police wanted to speak to him outside the door when, in

reality, Sears's boyfriend and another individual were lying in wait for Kendrick outside

13

the door and beat him up.[6]  (PHP Resp. to Interrog. No. 7 (Ex. C to Doc. No. 20)); (PHP

Exs. D & H to Doc. No. 13).)

## E.  Atkins's Employment History with PHP

Atkins's personnel file demonstrates that he was hired by PHP on February 16,

2004.  (Sears Ex. 2 to Doc. No. 15 (Personnel File).)  It also reveals that he was

terminated on September 18, 2004, for his alleged "failure to meet minimum job

requirements," a reason unrelated to Sears's sexual harassment allegations.  Atkins's

personnel file reveals no other disciplinary actions or any reference to Sears's complaint

of sexual harassment lodged against Atkins.[7]  (Id.)

## F.  Sears's EEOC Charge and Judicial Complaint

Seeking redress from PHP for sexual harassment and retaliation, on June 14, 2004,

Sears filed a sworn written charge with the Equal Employment Opportunity Commission

("EEOC").  (PHP Ex. F to Doc. No. 13 (Sears EEOC Charge).)  Because PHP has placed

---

[6] PHP's perceived version of events was garnered from statements taken from staff
who were present and witnessed the events at issue on May 10.  (See PHP Ex. D to Doc.
No. 13).)

[7] Sears points out that Atkins received a pay raise during his tenure with PHP.  The
court notes that the record also reveals that Sears received the same pay raise; that is, on
April 6, 2004, as part of an "across the board" pay raise, Atkins and Sears received an
increase in their hourly wages from $6.00 to $6.50.  (PHP Ex. D to Doc. No. 20); (Sears
Ex. 2 to Doc. No. 15.)

great weight on the alleged discrepancies between Sears's EEOC charge and her

deposition testimony in an attempt to restrict the scope of the summary judgment record,

the court sets out the entirety of Sears's factual assertions in her EEOC charge:

> I began working for [PHP] on or about March 2, 2004.  I sat with patients that [sic] needed assistance in their home.  Most of the patients had some type of mental disability.  Just a few days after I started to work [with] the above named employer[,] a male employee began to sexually harass me; his name is Brian Atkins.  He made the following statements to me:  "Bring your sexy ass here," "I want to see what you look like naked," and "Get under the covers with me."  Atkins would make constant comments to me[,] and he would try to touch me sexually and grab me.

> On or about May 4, 2004, I reported the sexual harassment and hostile environment to Mary Fitzpatrick, Home Manager, and John [sic] Burns, Owner.  My employer wanted to move me to another home[;] however, I informed them that I was comfortable with my 11:00 p.m. to 7:00 a.m. shift and that I did not want to move.  Brian Atkins was removed from the house and continued to work for the employer.  Brian Atkins continued to come by the house where I was working and smile at me.  I reported it to the head manager, Valerie Pettaway, a few days after I started to work for PHP[,] and she told me to stay away from him.  No action was taken to prevent the harassment.

> On or about May 10, 2004, two of Brian Atkins['s] cousins that [sic] work for the above named employer came to the house where I was working and assaulted me.  I called the police and signed arrest warrants for the two employees.  I called my mother to come help me because I was physically injured.  My mother attempted to come into the house to help me and was denied entry.

> I was terminated on May 12, 2004, and informed that I was terminated because my mother went to the house where I was working the day I was assaulted by two employees.  My mother did not enter the home where I was working[; she] was denied entrance by the two home-managers.

> I was also denied overtime for any hours I worked over 40 in a week.  And they also didn't pay me for the overtime that I worked.

> I believe that my employer terminated me because of my gender and
> in retaliation for my complaints of sexual harassment and hostile
> environment, in violation of Title VII of the "Civil Rights Act of 1964," as
> amended.

(PHP Ex. F to Doc. No. 13 (Sears EEOC Charge).)

After receiving a right-to-sue letter from the EEOC, Sears timely filed this lawsuit

on April 4, 2005.[8]  (See Compl. ¶ 2 (Doc. No. 1).)  Sears's complaint contains seven

causes of action:  (1) Title VII sexual harassment/hostile work environment; (2) Title VII

retaliation; (3) negligent hiring, training, supervision and retention; (4) assault;

(5) battery; (6) invasion of privacy; and (7) violation of the Fair Labor Standards Act

("FLSA").  On her Title VII claims, Sears seeks injunctive relief, compensatory and

punitive damages, reinstatement, back pay, front pay, prejudgment interest, attorney's

fees and costs.  (Id. at 4-6.)  She requests compensatory and punitive damages on her

state law claims, as well as costs, interest and attorney's fees.  (Id. at 7-9.)

On April 29, 2005, PHP filed its answer.  (See PHP Answer (Doc. No. 4).)  In its

answer, PHP admitted the following as to Sears's FLSA count:  "We [PHP] have found

Sears was not compensated fully in the manner appropriate for the hours that she worked

---

[8] PHP has not challenged Sears's allegations in the Complaint that Sears fulfilled the
jurisdictional requirements for filing a Title VII lawsuit.  (Compl. ¶ 3); Forehand v.
Florida State Hosp. at Chattahoochee, 89 F.3d 1562, 1567 (11th Cir. 1996) ("Before
instituting a Title VII action in federal district court, a private plaintiff must file an EEOC
complaint against the discriminating party and receive statutory notice from the EEOC of
his or her right to sue the respondent named in the charge.").  The court, therefore, finds
that, for purposes of ruling on the instant summary judgment motion, these Title VII
prerequisites have been satisfied.

while in the employ of PHP."  (Answer ¶ 21.)  On October 12, 2005, PHP filed an offer of judgment (Doc. No. 11) as to Sears's FLSA count, which Sears did not accept.  (See Sears Resp. at 2 (Doc. No. 16).)  PHP has not moved for summary judgment on Sears's FLSA count, and, for that reason, the court has construed PHP's motion as a partial motion for summary judgment.

## V.  DISCUSSION

### A.  Title VII

#### 1.  *Sexual Harrassment*

Sexual harassment violates Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  In order to establish that she was sexually harassed, Sears must prove:

> (1) that . . . she belongs to a protected group;
> (2) that [she] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;
> (3) that the harassment [was] based on [her] sex . . .;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and
> (5) a basis for holding the employer liable.

17

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  Elements one, two and three are not in dispute.  However, the fourth and fifth elements are contested and, thus, require discussion.  (See PHP Br. at 11-13 (Doc. No. 13)); (Sears Resp. at 11 (Doc. No. 16).)

(a) Severe or Pervasive Harassment

Sears must establish that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of her employment.  The severe or pervasive element "includes a subjective and an objective component."  Mendoza, 195 F.3d at 1246.

The subjective component focuses on the employee's perception.  See id.  The Mendoza court explained that "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable."  Id.

Initially, the court observes that the fact that Sears did not quit her job, but continued to report to work each day, notwithstanding the harassment she allegedly endured when she arrived there, does not diminish her ability to demonstrate the subjective component.  See, e.g., Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998) (under subjective component, law does not "require that [plaintiff] quit or want to quit the employment in question").  Sears has stated that she was "uncomfortable" and in "fear" of Atkins as a result of the alleged sexual harassment she endured.  (Sears Dep. at 24, 31, 97, 141, 145.)  The court finds that Sears's evidence is sufficient to warrant

18

jury consideration of whether Sears subjectively perceived the harassment as sufficiently severe or pervasive.  See Smith v. Norwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997) (fact that plaintiff was "humiliated" and "upset" by her supervisor's hostile remarks was adequate evidence to satisfy subjective component).  In any event, PHP has not challenged Sears's assertion that she subjectively believed that she endured severe and/or pervasive sexual harassment from Atkins.

The objective component requires the employee's belief to be objectively reasonable; that is, Sears must show that the harassment she suffered would cause a reasonable person in her position, considering all the circumstances, to find the working environment to be hostile or abusive.  Mendoza, 195 F.3d at 1246.  The court must consider the following factors in its objective analysis of whether the harassment "altered an employee's terms or conditions of employment:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Id. (citations omitted).  The objective analysis considers the totality of the circumstances in determining the severity and pervasiveness of the alleged harassing conduct.  Id.

Arguing that Sears has not demonstrated severe or pervasive conduct sufficient for a jury's consideration from an objective standpoint, PHP focuses on the incidents of sexual harassment which Sears set forth in her EEOC charge.  (PHP Br. at 11-12 (Doc. No. 11).)  Sears, on the other hand, relies also on her deposition testimony to support her

19

position that Atkins's "humiliating and vile acts," which included repeated acts of

"physical touching of Sears in the most intimate areas of her body," satisfy the severe or

pervasive requirement.  (Sears Resp. at 13-14 (Doc. No. 16).)  The parties's arguments

require the court first to determine the evidentiary scope of the summary judgment

record.


(i) Sham Affidavit Rule

Invoking the "sham affidavit" rule, PHP argues that Sears's EEOC charge conflicts

with the testimony Sears gave at her later deposition.  PHP contends that, contrary to

Sears's deposition testimony, Sears's EEOC charge, a sworn document filed in close

temporal proximity to the alleged harassment, does not contain any averment that Atkins

had any physical contact with Sears, only that he made inappropriate sexually-charged

comments to her and attempted to touch her.  PHP asserts that Sears cannot create a

genuine issue of material fact by submitting deposition testimony which alters, without

any explanation, the attestations in her EEOC charge concerning the alleged frequency,

nature and severity of the sexual harassment she allegedly endured from Atkins.  Citing

Beasley v. Conopco, 273 F. Supp.2d 1239, 1248 (M.D. Ala. 2003), PHP urges the court

to disregard all instances of sexual harassment in Sears's deposition testimony which are

not contained in Sears's prior EEOC charge on the ground that those portions of Sears's

deposition are "in clear contradiction to her Affidavit previously submitted under oath to

the EEOC."[9]  (PHP Reply at 2-3 (Doc. No. 20).)  For the reasons to follow, the court

disagrees with PHP.

In Beasley, the court recited the well-established rule in this circuit that, "[w]hen a

party has given clear answers to unambiguous questions which negate the existence of

any genuine issue of material fact, that party cannot thereafter create such an issue with

an affidavit that merely contradicts, without explanation, previously given clear

testimony."  273 F. Supp.2d at 1248 (quoting Van T. Junkins and Assoc., Inc. v. U.S.

Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)); see also McCormick v. City of Fort

Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we

may disregard an affidavit submitted solely for the purpose of opposing a motion for

summary judgment when that affidavit is directly contradicted by deposition testimony.").

The "sham affidavit" rule, as it commonly is referred, requires a showing of a "flat

contradiction" between an affidavit and an earlier deposition.  Tippins v. Celotex Corp.,

805 F.2d 949, 951, 953 (11th Cir. 1986).  As this court previously has observed, "[o]nly

---

[9] In its brief accompanying its motion for summary judgment, PHP does not explain
why its legal analysis of the "severe or pervasive" requirement fails to include
consideration of Sears's deposition testimony.  (See PHP Br. (Doc. No. 13).)  There is no
mention of the sham affidavit rule therein.  Because PHP raised the sham affidavit rule
for the first time in its reply brief, without offering a reason for failing to argue the point
in its original brief, the court is not obligated to consider it as a ground for summary
judgment.  See, e.g., U.S. v. Ga. Dep't of Natural Res., 897 F. Supp. 1464, 1471 (N.D.
Ga. 1995) ("This court will not consider arguments raised for the first time in a reply
brief.").  Nonetheless, the court has considered the argument for the sake of
thoroughness.  Given its rejection of the application of the rule, as discussed herein, the
court finds that Sears is not harmed by not having had an opportunity to respond to PHP's
argument.

those affidavit statements which are 'inherently inconsistent' with earlier deposition testimony should be stricken."  Brassfield v. Jack McLendon Furniture, 953 F. Supp. 1424, 1430 (M.D. Ala. 1996) (quoting Lane v. Celotex Corp., 782 F.2d 1526, 1531 (11th Cir. 1986)).  The sham affidavit rule sets a high threshold in order to prevent courts from invading the province of the jury by deciding credibility questions and weighing the evidence.  When, however, the threshold is satisfied, and a "transparent sham[]" is revealed, Tippins, 805 F.2d at 953, the rule appropriately is applied to "'spare the party requesting summary judgment the needless pain and costs of a law suit when a party's prior statements show no factual dispute exists.'"  Thomas v. Alabama Council on Human Relations, Inc., 248 F. Supp.2d 1105, 1112 (M.D. Ala. 2003) (discussing the "competing policies" which arise when a court evaluates whether to exclude an affidavit pursuant to the sham affidavit rule) (citation omitted).

Accordingly, an affidavit which merely is "at odds with statements made in an early deposition" should not be excluded.  Tippens, 805 F.2d at 954.  Similarly, an affidavit which clarifies, augments, elaborates or explains prior deposition testimony is not "inherently inconsistent" within the meaning of the sham affidavit rule.  See Simmons v. Chicago Bd. of Educ., 289 F.3d 488, 492 (7th Cir. 2002) (observing that a nonmovant "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits"); Leslie v. Grupo ICA, 198 F.3d 1152, 1157-1158 (9th Cir. 1999) (noting difference between a "sham" affidavit and an affidavit which elaborates, explains or clarifies facts, the latter of which is permissible); Messick v. Horizon Indus., Inc., 62

22

F.3d 1227, 1231 (9th Cir. 1995) (noting that, under sham affidavit rule, non-moving party is not precluded from "elaborating upon, explaining or clarifying prior testimony").

Before considering whether Sears's EEOC charge and her deposition testimony actually present inherent inconsistencies, the court makes the following observations. PHP's reliance on the sham affidavit rule is at odds with the general view of courts that deposition testimony is more reliable than affidavit testimony, given that the testimony of the deponent generally has been scrutinized through cross-examination. See Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 577-78 (2d Cir. 1969) ("'The deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.'") (quoting 6 Moore, Federal Practice ¶ 56.22[1] at 2814 (2d ed. 1965)); see also Wright, Miller and Kane, Federal Practice & Procedure, § 2738 (3d ed. 1998).  Here, at her deposition, Sears was represented by counsel and was subject to intense questioning by opposing counsel as to the details of her claims against PHP.  In contrast, when she filed her EEOC charge, there is no indication that Sears was aided by counsel in its preparation.  In fact, it is notable that PHP has not pointed to any case law addressing the situation of excluding deposition testimony in favor of an earlier, allegedly contradictory EEOC charge, notwithstanding that the sham affidavit rule expressly contemplates the exclusion of "sham *affidavits*" in favor of prior deposition testimony.

Moreover, PHP's position runs contrary to the prevailing views that EEOC charges are to be construed broadly when prepared without the assistance of counsel, as

23

appears to be the case here, see Danner v. Phillips Petroleum Co., 447 F.2d 159, 161-62 (5th Cir. 1971), and that a plaintiff's judicial complaint may encompass allegations which are "like or reasonably related" to the allegations in the EEOC charge, id., or "which can reasonably be expected to grow out of the charge of discrimination." Alexander v. Fulton County, Ga., 207 F.3d 1303, 1332 (11th Cir. 2000) (internal quotation and citation omitted). The court simply is unaware of any authority which requires that evidentiary specifics be set forth in an EEOC charge, and PHP has cited none. See, e.g., Bowe v. Exide Corp., Civ. A. 399cv2170D, 2001 WL 705881, *4 (N.D. Tex. 2001) (unpublished) (defendant "maintains that [plaintiff's] testimony regarding the alleged comments is contradictory and inconsistent because he did not mention the statements in his discrimination charge filed with the . . . EEOC . . . . It has cited no authority that requires that such evidentiary detail be set forth in an administrative charge or a federal court notice pleading.").

Against the foregoing legal backdrop, the court has compared the facts in Sears's EEOC charge with her deposition testimony to determine whether there are inherent inconsistencies between the two. In her EEOC charge, regarding her accusations of sexual harassment, Sears provides three examples of sexual comments which Atkins allegedly made to her on a "constant" basis. She then states that "Atkins would try to touch [her] sexually and grab [her]." (PHP Ex. F to Doc. No. 13 (Sears EEOC Aff.).) Sears's deposition testimony, however, provides additional facts not mentioned in her

EEOC affidavit.  It contains a detailed and graphic account of repeated sexual assaults.  (See, e.g., Sears Dep. at 23-24, 143.)

Although Sears's EEOC charge lacks the evidentiary detail contained in Sears's deposition testimony, the court finds that its incompleteness does not mean that the two sources of evidence are inherently inconsistent.  The EEOC charge, which Sears submitted without the assistance of counsel, arguably did not afford her the same opportunity as she had at the deposition, when thoroughly questioned by defense counsel, to address with specificity all of the incidents which form the basis of her sexual harassment claim.  During her deposition, Sears never recants any of the statements she made in her EEOC charge, nor does she negate her prior statements.  Rather, she supplies additional details in direct response to questioning from counsel for PHP.[10]  The court finds that the deposition testimony falls on the side of a permissible elaboration of Sears's claims, see Simmons, 289 F.3d at 49, rather than an impermissible "flat contradiction" of an earlier statement.  Tippens, 805 F.2d at 949; cf. Sanchez v. Standard Brands, Inc., 431 F.2d 455, 458, 465 (5th Cir. 1970) (although original EEOC charge only suggested that plaintiff had been a victim of abuse and harassment, her amended charge which "spelled out in greater detail facts tending to demonstrate such treatment" did not fatally vary from original EEOC charge).

---

[10] Among his questions, counsel for PHP stated, "I don't mean to make you uncomfortable, but I need to ask you these questions.  Exactly what did he do?  (Sears Dep. at 22-23.)  In his effort to be thorough, counsel probed as to the "where," "when," "what," and "how many."  (See, e.g., Sears Dep. at 22-30.)

The court finds that whether the omission of these crucial details from her EEOC charge affects Sears's credibility is a subject which is ripe for scrutiny during cross-examination at trial.  PHP will be afforded ample opportunity to question Sears as to her omissions.  Questions as to Sears's credibility and the weight of the evidence, however, belong to the province of the jury, not the court on summary judgment.  For present purposes, the court does not perceive that there exists such a direct contradiction between Sears's deposition testimony and EEOC charge or that the two sources of evidence are irreconcilably inconsistent.  The court, therefore, has considered both Sears's affidavit and her deposition testimony in ascertaining whether Atkins's alleged conduct was severe or pervasive.

(ii)  Analysis of the Severe or Pervasive Requirement

PHP urges the court to disregard Sears's deposition testimony, but does not address the effect of that evidence on the severe or pervasive analysis should the court disagree with its position.  The court construes PHP's silence as an admission that the grotesque, sexual acts about which Sears testified during her deposition satisfy the "baseline" for surviving summary judgment, as articulated in Mendoza, *supra*.  See Mendoza, 195 F.3d at 1244 (observing that judges "police the baseline" when they address Title VII hostile work environment claims at the summary judgment stage).  Even without a concession from PHP, however, the court would reach the same conclusion.

26

In <u>Mendoza</u>, where the plaintiff failed to satisfy the "baseline" on her Title VII sexual harassment claim, the Eleventh Circuit held that the following conduct, which spanned nearly eleven months, was not sufficiently severe or pervasive to alter the plaintiff's terms or conditions of employment: one statement by a supervisor that he was "getting fired up"; one incident when the supervisor rubbed his hip against the plaintiff's hip while touching her shoulder and smiling; two occasions where the supervisor made "sniffing" sounds while looking at the plaintiff's groin; one incident where he made a similar sniffing sound, but did not look at her groin; and testimony that the supervisor followed the plaintiff and stared at her (unaccompanied, though, by any evidence that the following and staring amounted to "stalking," "leering," intimidation or threats).  <u>Id.</u> at 1242, 1247, 1249.

In contrast, here, on a daily occurrence, indeed "every time" Sears and Atkins worked together, Atkins demanded, in the most crude of terms, that Sears have sexual intercourse with him.  In addition to using graphic and obscene language when propositioning Sears, he illustrated his desires by showing Sears his erect penis.  (Sears Dep. at 23-24.)  Atkins did not limit his propositions to words and illustrations.  Namely, when Sears refused his advances, he engaged in repeated physical assaults of Sears.  Over Sears's protestations, he would grab hold of her and then "rub [her] breasts," kiss her, squeeze her bottom,  "rub[]" her "down below" and "insert his finger into [her] vagina." (<u>Id.</u> at 24, 143.)

These obscene epithets and unwelcome physical assaults are quite different from the behavior at issue in Mendoza, where the court questioned whether the harasser's conduct included the "necessary sexual or other gender-related connotations to be actionable sex discrimination." 195 F.3d at 1247. Unlike the single brush against the hip incident in Mendoza, the forceful manner in which Atkins invaded Sears's private parts leaves no ambiguity that the touching was intentional, physically threatening, sexually motivated and humiliating. See Smith v. Auburn Univ., 201 F. Supp.2d 1216, 1225 (M.D. Ala. 2002). Atkins's conduct, as graphically described by Sears, created a work environment where Sears was "fair game" for uninviting touching, offensive propositions, and lewd comments. Faragher v. City of Boca Raton, 864 F. Supp. 1552, 1562 (S.D. Fla. 1994), aff'd, 524 U.S. 775 (1998).

Moreover, the court finds that the conduct in this case, although it spans a shorter time frame, is much more frequent than that in Mendoza. Atkins's comments and assaults occurred essentially every time Sears went to work and occurred for the entire duration of her employment with PHP. Compare Mendoza, 195 F.3d at 1249 (holding that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of [the supervisor] making a sniffing sound" were not frequent).

Based on the foregoing, the court finds that, under the totality of the circumstances, Sears has created a genuine issue of material fact as to whether the conduct of Atkins was sufficiently severe or pervasive to alter the terms or conditions of

her employment.  Sears, however, also must establish PHP's responsibility for the sexual misconduct of Atkins.  It is to this issue that the court now turns.

### (b)  A Basis for Holding the Employer Liable

Concerning the fifth <u>Mendoza</u> element, the test for employer liability differs depending upon whether the harasser is a co-employee or a supervisor.  <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998) ("<u>Ellerth</u>"); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) ("<u>Faragher</u>").  Here, it is not disputed that Atkins was Sears's co-employee.  He was not a supervisor.

"Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action."  <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1278 (11th Cir. 2002).  "Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer."  <u>Id.</u>  For the reasons to follow, the court finds that a reasonable jury could conclude that PHP failed to take prompt remedial action, notwithstanding its actual notice of the sexual harassment. The court, thus, need not, and declines to, consider whether PHP had constructive knowledge.

PHP focuses on its response to Sears's complaint about Atkins's alleged sexual harassment which Sears reported on May 4, 2004, to Fitzpatrick, Pettaway and Burns, at

the urging of her then-boyfriend.  (PHP Br. at 12 (Doc. No. 13)); (PHP Reply at 4 (Doc. No. 20).)  In its brief, PHP states that, "without any internal investigation into the matter, PHP immediately reassigned [Atkins] so as to avoid having him being present in the same building or on her shift."  (Id. at 12.)  For summary judgment purposes, there are at least two flaws with PHP's argument and, thus, two impediments to granting PHP's motion for summary judgment on the Title VII sexual harassment claim.

First, PHP has not addressed or mentioned Sears's complaint which she lodged with Fitzpatrick on or around April 2, 2004.  When Sears complained to Fitzpatrick on this date, Fitzpatrick expressed her skepticism as to the validity of Sears's accusation and essentially placed the burden on Sears to prevent the harassment when Fitzpatrick said, "Just try to stay away from him."  (Sears Dep. at 31-32.)  There is no evidence that Fitzpatrick undertook any investigation or remedial efforts in response to Sears's first complaint.  The evidence reveals instead that, although Fitzpatrick said she would "check into" moving Atkins to a different shift, Sears heard nothing else from her, and the harassment continued unabated.  (Id. at 34.)  In fact, Fitzpatrick appears to have ignored Sears's attempts to contact her, as Sears testified that, after she reported the harassment to Fitzpatrick, Fitzpatrick would not return her pages.  From aught that appears, and for purposes of summary judgment, Sears's complaint on or around April 2 was ineffectual in obtaining any corrective response from PHP.  Furthermore, the court finds that Sears's complaint to Fitzpatrick on or around April 2, constitutes actual notice to PHP of the alleged sexual harassment, because Fitzpatrick, who was Sears's supervisor, was

designated in PHP's anti-harassment policy as the individual to whom Sears was required to report incidents of sexual harassment.[11]  (PHP Ex. B to Doc. No. 13 (Anti-Harassment Policy)); Breda v. Wolf Camera & Video, 222 F.3d 886, 899 (11th Cir. 2000) (reiterating that in this circuit "if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment") (citing Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999)).

Second, regarding Sears's complaint on May 4, 2004, the complaint upon which PHP solely relies, Sears has presented evidence that PHP's response, i.e., moving Atkins to a different shift, was ineffective in halting the harassment.  Namely, there is evidence that two or three times after Atkins changed shifts, Atkins would arrive early for his 7 a.m. shift, while Sears was working.  On those occasions, he threatened to come to the home in the middle of the night when she working and inferred that he would recreate the sexual scenes from the past.  (Sears Dep. at 50.)  At the same time, as an illustration of what he would do, Atkins used his hand to simulate sexual intercourse.  (Id. at 139-40.)

---

[11] To the extent that PHP contends that Sears's failure to report the alleged harassment within 48 hours of its occurrence, as mandated by the anti-harassment policy, precludes a finding of knowledge, that argument relates, if at all, to a constructive knowledge theory. See, e.g., Miller, 277 F.3d at 1269 (holding that a comprehensive, publicized anti-harassment policy will prevent "constructive knowledge of such harassment from adhering to the employer," where the victimized employee fails to invoke the policy's complaint procedures).  As stated, having found actual notice, the court need not determine whether PHP had constructive knowledge of the harassment.

31

Although Sears reported at least one of these incidents to Fitzpatrick, Sears says that she

received no response from anyone at PHP.  (Id. at 50-51, 54, 140.)  Sears's testimony

injects into this litigation material factual discrepancies surrounding whether PHP's

response to Sears's May 4 complaint was effective as a remedial measure.

(c) Conclusion

In sum, the court finds that Sears has successfully demonstrated alleged conduct

by a co-worker sufficiently severe or pervasive to support an actionable sexual

harassment claim pursuant to Title VII.  Furthermore, the court finds that Sears has

presented evidence establishing a specific basis for imputing that conduct to PHP.

Accordingly, the court finds that summary judgment is due to be denied on Sears's Title

VII sexual harassment claim.

2.  *Retaliatory Discharge*

Title VII also prohibits retaliation against employees who complain of

discrimination by filing an EEOC charge or otherwise voice opposition to alleged

discriminatory employment practices.  See 42 U.S.C. § 2000e-3(a) (providing that "[i]t

shall be an unlawful employment practice for an employer to discriminate against any of

his employees . . . because he [or she] has opposed any practice made an unlawful

employment practice by this subchapter.").  The applicable test for considering whether

Sears has established a claim of Title VII retaliation, based upon her reliance on

32

circumstantial evidence, follows the McDonnell Douglas, burden-shifting formula.  See

411 U.S. 792 (1972).  To demonstrate a prima facie case of retaliation, Sears must show

that (1) she engaged in protected activity, (2) an adverse employment action occurred and

(3) a causal link exists between the protected activity and the adverse action.  See Griffin

v. GTE Florida, Inc., 182 F.3d 1279, 1281 (11th Cir. 1999).  If she produces evidence

sufficient to make out a prima facie case, a presumption arises that PHP unlawfully

retaliated against her in taking the alleged adverse employment action.  See St. Mary's

Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

PHP must then rebut the presumption of a retaliatory motive by producing

evidence that the negative employment action was motivated instead by a legitimate,

nondiscriminatory reason.  See id. at 509.  PHP's "burden is one of production, not

persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing

Prod., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509).

Finally, to avoid summary judgment, Sears must respond with evidence, which may

include previously produced evidence establishing a prima facie case, which would allow

a reasonable jury to conclude that the reasons given by PHP were not the real reasons for

the adverse employment decision.  See Combs v. Plantation Patterns, 106 F.3d 1519,

1528 (11th Cir. 1997); see also Reeves, 530 U.S. at 143.

Applying the foregoing familiar principles, the court considers the three elements

of the prima facie case.  The first and second elements are not in contention.  It is

undisputed that Sears engaged in a protected activity when she complained of sexual

harassment to her superiors, Fitzpatrick, Pettaway and Burns.  See Rollins v. State of Florida Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (protection of Title VII anti-retaliation provisions extends to employees who informally voice complaints to supervisors or use employer's internal grievance procedure).  It also is undisputed that Sears was subjected to an adverse employment action when she was terminated from her employment with PHP on May 11, 2004.  See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) ("termination is certainly an adverse employment action").

Having satisfied the first two prongs of a prima facie retaliation claim, Sears must now show a causal connection between the statutorily protected conduct and her termination.  To demonstrate the causal link, Sears need only show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated."  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (quotation omitted).

Sears contends that her protected activity and her termination are not wholly unrelated given the close temporal proximity between her complaints of harassment to Fitzpatrick, particularly her May 4, 2004 complaint, and her termination on May 11, 2004.  (Sears Resp. at 15 (Doc. No. 16).)  PHP, however, argues that Sears's involvement in the brawl which occurred at the group home on May 10, the day prior to Sears's termination, constitutes an intervening event which breaks any causal connection between

Sears's termination and the protected expression.  (PHP Br. at 14 (Doc. No. 13).)  PHP, thus, argues that the evidence is lacking as to the third prima facie element.

Although "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection," at least where the decisionmaker is aware of the protected conduct, Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791 (11th Cir. 2000), there are circumstances when the "inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established."  Wu v. Southeast-Atlantic Beverage Corp., 321 F. Supp.2d 1317, 1337 (N.D. Ga. 2004) (collecting cases); see also Booth v. Birmingham News Co., 704 F. Supp. 213, 215-16 (N.D. Ala.1988) (finding that short time span did not create reasonable inference of retaliation where the record contained "intervening factors," i.e., other reasons for the adverse action arising after the protected activity), aff'd without op., 864 F.2d 793 (11th Cir. 1988).

The court has some doubt whether Sears has satisfied the third element of her prima facie case, given the intervening brawl.  The court, however, concludes that it need not resolve this issue because it finds that PHP has offered a stronger ground for summary judgment, that is, Sears's failure to create a genuine issue of material fact regarding pretext.  The court, therefore, will assume *arguendo* that Sears established a prima facie case of retaliation.

PHP has proffered three reasons, unrelated to Sears's internal complaints of sexual harassment, for its decision to terminate Sears, one of those reasons being that PHP had received information that Sears had been the instigator and cause of a physical altercation occurring on property where she worked.  (PHP Br. at 15 (Doc. No. 13); (PHP Reply at 5 (Doc. No. 20)); (PHP Resp. to Interrog. 7 (Ex. C to Doc. No. 20)); (See PHP Exs. D & H to Doc. No. 13).)  More specifically, the evidence reveals that PHP based its decision to terminate Sears, in part, on PHP's determination that Sears had "assaulted . . . Rodriguez physically and told . . . Kendrick that the police were at the door to speak him," when actually, Sears's boyfriend and a friend were waiting outside and "started beating" Kendrick when he opened the door.  (PHP Resp. to Interrog. 7 (Ex. C to Doc. No. 20).)  Physically assaulting or threatening another employee violates company rules and subjects an employee to discipline, up to and including termination.  (Attachment to PHP Ex. F (Doc. No. 20).)  PHP's belief that Sears started the fight and is the one at fault for the events occurring on May 10, even if that belief is erroneous, reflects a legitimate, non-discriminatory explanation for the decision to fire her.  See Chapman v. AI Transport, 229 F.3d 1012, 1030-31 (11th Cir. 2000) (holding defendant may terminate an employee for good or bad reason without violating federal law); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (holding an employee may be fired "for good reason, bad reason, reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason").

To establish pretext, Sears must offer evidence (1) that PHP's proffered reason has no basis in fact, (2) that the proffered reason did not actually motivate the employment decision, or (3) that the alleged reason was insufficient to motivate the employment decision.  See Holston v. The Sports Auth., Inc., 136 F. Supp.2d 1319, 1338 (N.D. Ga. 2000).  Sears, however, cannot meet this standard.  Sears does not deny that she was involved in the fight at issue.  Rather, she premises her pretext argument on an assertion that she was not at fault.  She claims that she was the victim, and, thus, should not have been punished by PHP.  She similarly takes issue with the fact that Rodriguez and Kendrick were not terminated for their involvement in the fracas, but that she was fired. (Sears Resp. at 17-18 (Doc. No. 16)); (see also PHP Ex. F to Doc. No. 13 (Sears EEOC Charge).)

The evidence Sears proffers in support of her argument, however, is insufficient to establish a genuine issue of material fact for trial.  The evidence does not demonstrate that PHP acted contrary to its stated reason that it believed that Sears had caused the fight and initiated and planned an attack on Rodriguez and Kendrick.  Where, as here, the decisionmaker did not personally observe the alleged misconduct, but instead relied on second-hand information that the employee committed the violation, the employee must submit "evidence which raises a question as to whether the decisionmaker, in fact, knew that the violation did not occur and, despite this knowledge, [disciplined] the employee based upon the false premise of an alleged work rule violation."  Sweeney v. Alabama Alcoholic Beverage Control Bd., 117 F. Supp. 2d 1266, 1272 (M.D. Ala. 2000).

37

Assuming that Sears is correct that she was the victim and the other witnesses who provided information to PHP were all lying, the record is devoid of any evidence suggesting that the PHP "knew that [Sears] had not committed the violation[] but chose anyway to rely on false information that the infraction[] had occurred." Id. at 1273-74. At most, the court finds that the evidence reveals that all involved in the decisionmaking process were mistaken as to their belief that Sears did not incite the fight. A mere mistaken belief is insufficient to establish Title VII liability.[12] See id. at 1274; see also McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

Sears's failure to present evidence that PHP's neutral reason for her termination was a pretext negates any finding of purposeful retaliation. Although, as stated, PHP proffers two additional nondiscriminatory reasons for Sears's termination, the court need

_____

[12] Sears asserts that she "swore out a warrant" for Rodriguez's arrest. She further contends that Rodriguez pleaded guilty to the charge, thereby establishing that she "was not the aggressor." (Sears Resp. at 17 (Doc. No. 16).) First of all, the evidence establishes to the contrary. Namely, PHP has submitted the "case action summary" from the state court proceedings involving the charge of assault, third degree, against Rodriguez. (See Ex. E to Doc. No. 20).) That document establishes that, after a trial, the district judge found Rodriguez "not guilty as charged" on July 1, 2004. (Id.) The evidence, therefore, cannot be relied upon to demonstrate that the reason advanced by PHP had no basis in fact. However, even if Sears were correct in her contention that Rodriguez admitted guilt during the court proceedings, the court fails to see how that disposition would have had any affect on whether PHP believed Sears instigated a fight on PHP's premises when it terminated Sears on May 11, 2004.

not examine these reasons because a plaintiff must demonstrate pretext as to all of the reasons in order to survive summary judgment.  See Chapman v. AI Transport, 229 F.3d 1012 (11th Cir. 2000) (requiring plaintiff to rebut each nondiscriminatory reason, where there are multiple reasons asserted, in order to avoid summary judgment).  Summary judgment, therefore, is due to be entered in favor of PHP on Sears's Title VII retaliation claim.

### B. Supplemental State Law Claims

Sears also seeks relief under state law for the sexual harassment she allegedly endured from Atkins.  Alabama law, however, "does not recognize a distinct cause of action for sexual harassment," Taylor v. Stevenson, 820 So.2d 810, 811 (Ala. 2001).  Sears, therefore, has sued PHP for negligent hiring, training, supervision and retention, as well as for assault, battery and invasion of privacy.  PHP has moved for summary judgment on each of the state law claims.

### 1.  Negligent Hiring, Training and Supervision

As stated, Sears brings a state law claim for negligent hiring, training, supervision and retention.  The negligent retention claim is addressed in the next subsection.  As to the negligent hiring claim, Sears concedes that summary judgment is due to be entered in PHP's favor.  (Sears Resp. at 18 n.9 (Doc. No. 16).)  The court, thus, need only devote its

analysis in this subsection to the negligent training and supervision aspect of Sears's negligence claim.[13]

As grounds for her negligent training and supervision claim, Sears complains that PHP breached its duty of care to her by failing to take "adequate" steps, or for that matter any steps, "to investigate Sears's first complaint of sexual harassment" which she made on or around April, 2, 2004, by failing to prevent Atkins from repeating his sexual harassment of Sears, and by failing to properly train Atkins so as to prevent his harassing behavior.  (Sears Resp. at 19 (Doc. No. 16).)

PHP has moved the court to enter summary judgment in its favor on Sears's negligent supervision and training claim.  PHP's criticism of Sears's negligence claim, however, is brief.  PHP sets forth in terse fashion, without analysis, that "Sears has offered no affirmative evidence which suggests PHP had any knowledge of or could determine with due and proper diligence that Atkins would perform the alleged conduct." (PHP Br. at 17 (Doc. No. 13).)  PHP also contends that it adequately responded to Sears's accusations against Atkins because after Sears complained on May 4, 2004, PHP moved Atkins to a different shift and retrained Atkins "on the sexual harassment policies of PHP."  (PHP Reply at 6 (Doc. No. 20).)  For the reasons to follow, the court disagrees with PHP.

---

[13] The court observes that there is no discernible distinction between claims of negligent supervision and claims of negligent training, and, thus the court treats these two claims as one.  See Zielke v. AmSouth Bank, N.A., 703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1996).

The Supreme Court of Alabama has stated, in the context of discussing a plaintiff's claim for negligent training and supervision, that

> [i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.  While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

Armstrong Bus. Servs. v. AmSouth Bank, 817 So.2d 665, 682 (Ala. 2001) (citations and internal quotation marks omitted).

The "incompetency" of the offending employee in a negligent training and supervision claim, as set out in Armstrong above, must be based on an injury resulting from a tort which is recognized under Alabama common law.  See Stevenson v. Precision, 762 So.2d 820, 824 (Ala. 1999) (affirming summary judgment on negligent supervision/training claim for lack of underlying tort claim).  As previously set out herein, Alabama common law does not recognize a tort of sexual harassment in which employers would have a duty to protect their employees, see Taylor, 820 So.2d at 811, but as discussed in the next subsection, Sears has satisfied this inquiry because the facts

taken as true demonstrate that Atkins committed the underlying torts of assault, battery and invasion of privacy.

The court, thus, turns to PHP's statements pertaining to its alleged lack of notice of the alleged harassment and the sufficiency of its investigation of and response to Sears's complaint.  The court is guided by the Supreme Court of Alabama's opinion in Machen v. Childersburg Bancorporation, Inc., upon which Sears relies.  See 761 So.2d 981, 987 (Ala. 1999).

In Machen, the Supreme Court of Alabama analyzed whether an employee's claim that her supervisor had sexually harassed her was actionable as a claim of negligent investigation, supervision and discipline.  See 761 So. 2d 981, 987 (Ala. 1999).  The plaintiff, who worked as a loan processor for the defendant-bank, alleged that her direct supervisor began making "lewd and sexually suggestive" remarks to her and also "touched her in an offensive manner."  Id. at 982.  The plaintiff reported the incidents to her employer's chief operations officer ("COO"), who instead of investigating her claim, directed the bank's chief executive officer ("CEO") to handle the matter.  Id. at 982-83.  The CEO merely told the plaintiff's supervisor to be "careful" and to be "aware" of the company's policy against sexual harassment.  Id. at 983.  No written reprimand or follow up investigation was made.  See id.  According to the plaintiff, the harassment ceased for a time, but the plaintiff was still forced to work with him.  Approximately four months after the plaintiff made her complaint, the harassment resumed.  See id.

The Supreme Court of Alabama held that, viewed in the light most favorably to the plaintiff, "the evidence creates a genuine issue of material fact as to whether the bank defendants took adequate steps to investigate [the plaintiff's] complaint of sexual harassment and to train bank employees, including [the harassing supervisor], regarding the bank's policies prohibiting sexual harassment, and whether they took appropriate disciplinary measures to remedy the situation." Id. at 987. The court made note of the undisputed fact that the COO "chose not to investigate" the plaintiff's claim when she initially reported her supervisor's harassing conduct. Id. The disciplinary measures, as observed by the court, included only an oral reprimand, and neither the COO nor the CEO made any inquiry as to whether the harassment had stopped. The ineffectiveness of the discipline was further evidenced by the fact that the harassment resumed. Id. at 987.

Here, as in Machen, and in fulfilment of Armstrong's "affirmative proof" requirement, 817 So.2d at 682, the court finds that Sears has submitted positive evidence that PHP actually knew and was fully aware of Atkins's alleged incompetence in or around early April 2004. Namely, Sears has presented evidence that on or around April 2, 2004, approximately one month prior to Sears's second complaint on May 4, 2004, Sears told her direct supervisor, Fitzpatrick, that she had been placed in an "uncomfortable" position at work. (Sears Dep. at 31.) When probed by Fitzpatrick, Sears described Atkins's sexual advances, including his physical sexual assaults. (Id. at 31-32.) PHP has not argued that notice to Fitzpatrick is insufficient to constitute notice to PHP. In any event, as discussed in other parts of this opinion, any such argument

43

would prove unconvincing, given that Fitzpatrick, as Sears's supervisor, was the individual expressly designated by PHP to receive and report to the program manager complaints of sexual harassment.  (PHP Ex. B to Doc. No. 13 (Anti-Harassment Policy at 2).)

Not only does the evidence, viewed in the light most favorable to Sears, establish actual notice on the part of PHP of Atkins's conduct, but it also reveals the inadequacy of Fitzpatrick's response.  The facts here are more egregious than those presented in Machen because Fitzpatrick did absolutely nothing in response to Sears's first complaint. Fitzpatrick essentially discredited Sears, remarking, "Oh Brian [Atkins]?" and "Not Brian," and merely suggested that Sears should "[j]ust try to stay away from him."  (Sears Dep. at 31-32.)  Only when pressed by Sears as to whether Fitzpatrick "could move Atkins to a different shift" did Fitzpatrick reply that she "would check into it."  (Id. at 34.)  Yet, after this day, Sears heard nothing further from Fitzpatrick, and Fitzpatrick ignored Sears's repeated pages.  (Id. at 34.)  Based on Fitzpatrick's reaction to Sears's first complaint on or around April 4, the court finds that, as in Machen, "[a] jury could conclude that had [PHP] properly investigated the incident, [it] would not have allowed [Atkins] to remain in a position where he could abuse his authority."  761 So.2d at 987.

Moreover, although the evidence establishes that approximately a month after Sears lodged her first complaint, PHP engaged in remedial efforts in response to her second complaint, the court finds that there also are disputed issues of fact as to whether PHP's response to Sears's second complaint was sufficient to protect her from Atkins's

44

behavior.  Although PHP moved Atkins to another shift, the end of his shift intersected

with the beginning of Sears's shift.  On two or three occasions, Atkins purposefully

arrived early for his shift.  He made obscene hand gestures to Sears and suggested that he

intended to visit the group home at night when she was working and reignite the "same"

familiar sexual scenes.  (Sears Dep. at 47-50, 139-40.)  As in <u>Machen</u>, there is no

evidence that anyone ever conducted any follow up investigation to ensure that the

harassment had stopped, and the evidence reveals that Atkins did not receive any written

warning.  There also is no report or mention of Sears's sexual harassment complaint in

Atkins's personnel file.  Moreover, when Sears brought to Fitzpatrick's attention that

Atkins had resumed the harassment, Fitzpatrick did nothing.  (<u>Id.</u> at 50-51, 140.)  The

court finds, as in <u>Machen</u>, that "[a] jury could . . . conclude that had [PHP] monitored

and/or supervised the situation more carefully, [Atkins] would not have repeated the acts

of misconduct."  761 So. 2d at 987.  In sum, the court finds that summary judgment is due

to be denied on Sears's negligent training and supervision claim.


### 2.  Negligent Retention

Sears also complains that PHP breached its duty of care to her by permitting

Atkins to remain employed with PHP without any negative repercussions imposed upon

him to curb the harassment.  For essentially the same reasons espoused in the preceding

subsection, PHP's motion for summary judgment is due to be denied on Sears's negligent

retention claim.

"Alabama law recognizes the tort of negligent retention which makes an employer liable to its employees for the negligent acts of a co-employee."  Boham v. Regions Mortg., Inc., 129 F. Supp.2d 1315, 1331 (M.D. Ala. 2001) (citing McDuff v. Kurn, 172 So. 886, 887 (1937)).  Pursuant to Alabama law, an employer may be held liable for an employee's tortious conduct on a negligent retention theory when the employer "knows or should know" that its employee "is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer."  Brown v. Vanity Fair Mills, Inc., 277 So.2d 893, 894 (1973); see also Patterson v. Augat Wiring Systems, Inc., 944 F. Supp. 1509, 1528 (M.D. Ala. 1996).  Where the evidence establishes a breach of the employer's duty not to retain an unfit employee, as described above, and that breach proximately causes the plaintiff's injuries, a plaintiff can recover on a state law negligent retention claim.

Here, Sears's evidence clearly demonstrates that a reasonable jury could conclude that Atkins was an unworthy employee.  There also is evidence that PHP was put on actual notice of Atkins's sexually harassing behavior when Sears complained of Atkins's conduct in early April 2004, to Fitzpatrick and again on May 4, 2004, to Fitzpatrick, Pettaway and Burns.  Yet, as discussed earlier in this opinion, there is evidence that, notwithstanding its actual notice, PHP initially took no measures to rectify the harassment.  When PHP finally acted on Sears's second complaint of harassment, lodged on May 4, 2004, there is evidence that PHP's measures were inadequate.  Indeed, the harassment resumed a short time after PHP moved Atkins to a different shift.  The court,

46

therefore, finds that whether PHP unreasonably retained Atkins is for determination by a jury.  This claim proceeds to trial.

### 3.  *Assault, Battery and Invasion of Privacy*

Sears seeks to hold PHP liable for Atkins's alleged sexual harassment, contending that the harassment constituted the torts of invasion of privacy, assault and battery.  Her theory is that PHP ratified Atkins's intentional torts and that, therefore, it is liable under the doctrine of respondeat superior.  (Sears Resp. at 20-21 (Doc. No. 16).)

In order to show that PHP ratified Atkins's torts, in addition to establishing the elements of the underlying torts, Sears must show that: (1) PHP had actual knowledge of the tortious conduct; (2) based on this knowledge, PHP knew the conduct constituted a tort; and (3) PHP failed to take adequate steps to remedy the situation.  Potts v. BE & K, 604 So.2d 398, 400 (Ala. 1992).

The court turns first to the threshold inquiry of whether the facts create a jury issue on the underlying torts allegedly committed by Atkins.  The requirements of proof as to assault, battery and invasion of privacy are as follows.

An "assault," under Alabama law, is the "'intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'"  Wood v. Cowart Enterprises, Inc., 809 So.2d 835, 837 (Ala. Civ. App. 2001) (citation omitted).

The elements of battery are as follows: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte* Atmore Cmty. Hosp., 719 So.2d 1190, 1193 (Ala. 1998).  To prove an invasion of privacy, a plaintiff must demonstrate the following: "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation."  Id. at 1194.

As its sole ground for summary judgment on the merits of the above three torts, PHP argues, as it did in relation to Sears's Title VII sexual harassment claim, that the court's summary judgment review is confined to consideration of the averments in Sears's EEOC charge.  Because Sears's accusations in her EEOC charge are limited to "inappropriate comments" made by Atkins and attempted, but not actual, touchings, PHP contends that Sears cannot demonstrate a genuine issue for trial on these underlying torts. (PHP Reply at 6-7 (Doc. No. 20).)  The court already has rejected PHP's argument as to the scope of the record, and the court need not repeat its findings here.  Suffice it to say, the court has considered Sears's deposition testimony, as well as her EEOC charge, in ascertaining whether the evidence presents a triable issue on her state law claims.

In *Ex Parte* Atmore Community Hospital, the plaintiff's supervisor "touched [plaintiff's] waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg."  719 So.2d at 1194.  There also was evidence that the touchings were intentional, sexual in nature and unwelcome.  Id.  The

48

Supreme Court of Alabama held that, based on these facts, the plaintiff had presented more than ample evidence to raise a jury issue as to whether her supervisor's sexual harassment of her amounted to a battery and an invasion of privacy.  See 719 So.2d at 1194.

Clearly, the same conclusion as in Ex Parte Atmore Community Hospital is required in this case.  As discussed in more detail during the court's discussion of Sears's Title VII sexual harassment claim, Sears has offered evidence of Atkins's repeated, unwelcome sexual assaults and touchings in the most intimate areas of her body, including her breasts, buttocks and vagina.  The court finds that her evidence is sufficient to create a jury issue on the underlying torts of assault, battery and invasion of privacy. Indeed, the court observes that PHP has offered no argument that the record, when considered its entirety, contains sufficient evidence as to these torts.

PHP's primary argument concerns the alleged absence of evidence of ratification. (PHP Br. at 17-18 (Doc. No. 13).)  PHP focuses on Sears's May 4, 2004, complaint, without mention of her prior complaint in early April 2004, and contends that, once "the alleged conduct was brought to [its] attention," PHP took "immediate and adequate steps . . . to ensure such situation would not occur in the future."  (Id. at 18.)  The court, however, disagrees with PHP and finds that Sears has presented evidence which raises a jury question on the issue of whether PHP ratified Atkins's acts after learning of them.

At the summary judgment stage, the court is not at liberty to disregard Sears's deposition testimony that she complained of sexual harassment, not only on May 4, 2004,

49

but also a month earlier.  As discussed in the preceding section, PHP received actual
notice of Atkins's sexual harassment in early April 2004, when Sears's reported Atkins's
conduct to Fitzpatrick.  In addition to informing Fitzpatrick that she felt "uncomfortable"
at work due to Atkins, Sears also told Fitzpatrick about the nature of Atkins's sexually
harassing behavior in response to Fitzpatrick's questioning.  (Sears Dep. at 31-32.)  Based
upon Sears's complaint to Fitzpatrick, the court finds that in early April 2004 PHP knew
or, at the very least, should have known that Sears was the victim of multiple assaults and
batteries at the hands of Atkins and that Atkins had invaded her privacy, within the
meaning of Alabama law.  Yet, as elaborated upon in the preceding section, the evidence,
viewed in the light most favorable to Sears, demonstrates that PHP did nothing until
approximately one month later when Sears again complained of Atkins's harassment on
May 4, 2004, and that those remedial efforts arguably were ineffective in preventing harm
to Sears by Atkins.  Accordingly, based on the foregoing the court finds that PHP's
motion for summary judgment on Sears's state law claims for assault, battery and
invasion of privacy is due to be denied.

## VI. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that PHP's partial
motion for summary judgment (Doc. No. 12) be and the same is hereby GRANTED in
part and DENIED in part as follows:

(1) DENIED on Sears's Title VII sexual harassment claim;

(2) GRANTED on Sears's Title VII retaliation claim;

(3) GRANTED on Sears's state law claim for negligent retention; and

(4) DENIED on Sears's state law claims for assault, battery, invasion of privacy, and negligent training, supervision and retention.

DONE this 10th day of April, 2006.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE